ESTATE OF EVANS: EVANS, Administrator, Appellant, vs. JONES, Respondent.

*March 11—April 12, 1946.*

For the appellant there was a brief by *William E. Vojack*, attorney, and *Rubin, Zabel & Ruppa* of counsel, all of Milwaukee, and oral argument by *Mr. Vojack* and *Mr. Nathan Ruppa*.

*Raleigh H. Thurwachter* of Waukesha, for the respondent.

FRITZ, J.    Under the evidence the following appears without dispute in any material respect, to wit: The claimant is sixty-seven years of age, and resides on a Waukesha county farm with her husband, a forty-seven-year-old son, Gordon Jones, and two granddaughters, Helen Martin aged eighteen years and another aged thirteen years.    William Evans, the deceased, had known claimant and her husband, Robert Jones, over forty-seven years; and they were good friends.    In July, 1940, Evans came to their farm and asked if he could room and board with them, and they agreed he could do so for $7 a week, which he said was all he could afford to pay.    He lived with them from July until September, 1940, when he returned to Milwaukee for a prostate operation.    In February, 1941, the claimant and her husband agreed with Evans that he could return to their farm on the same arrangement; and he stayed there from April 15, 1941, until he died intestate on June 10, 1944, at the age of eighty-two years.    He was mentally alert,

active, attended to his business, and was not incapacitated or bedridden until he began to rapidly fail in health three or four weeks before his death.

Mrs. Jones testified that when Evans came to live on the farm in 1940 he was addicted to wetting his bed and soiling his clothes considerably, which occurred almost daily; that on occasions he had difficulty with his bowels; that after he returned in 1941 his bed wetting was not as aggravated as previously, but it still persisted; that she also took care of washing his clothing, cleaning up after him, washing bed sheets, on occasions bringing breakfast to him in bed, and rubbing his back with alcohol on several occasions; but that she kept no record of the services or the time involved in her work for and on behalf of Evans, and she never asked him for any more money for his care and room and board than the $7 which he paid her regularly. She testified, on an adverse examination, that it took her more than an hour a day to look after Evans. On cross-examination on the trial she testified:

"It would probably take an hour and a half washing Mr. Evans' clothes, getting them dry and all that and bringing them in. It takes a good hour and a half to get them back on the bed and everything. I had to be satisfied with the $7 a week I received for the room and board at that time.

"Q. You were then satisfied to accept the $7 a week, isn't that correct? A. Yes."

And on redirect examination she testified:

"When I said I was satisfied with the $7 a week I meant just for the board I am satisfied. The $7 was to be for the board. He said that he could pay only $7 for that and that he would make his will. He said he would make his will and take care of me if I take care of him to the end of his days."

(Additional testimony by claimant and further redirect examination of her in relation to conversations between her and the deceased were objected to and her testimony was excluded as incompetent.)

Helen Martin testified:

"I heard conversations between my grandmother and Mr. Evans relative to his paying for any services performed by my grandmother. Every once in a while he would mention that he knew he was a great bother to my grandmother and that he could not afford to pay any more than $7 a week for board and room, but he knew that she deserved a better payment and he always mentioned that he would see she was well taken care of. I heard him make that statement so many times I have lost track. I know he attempted to make a will. . . . He told me how he wanted the will made out. He wanted to cut off his children entirely but he did want to leave a trust for his two grandchildren. The rest would go to the person who had taken care of him until he was dead. . . . He didn't say anything else about paying my grandmother greater board, he just kept saying he was going to see she would be taken care of. The first time I heard those words was about five weeks after he arrived the first time. He made the remark that if he could stay there he said he would see she was well taken care of. . . . That is what he told Mary Jones, my grandmother, and it was within my hearing."

Gordon Jones testified:

"I never heard Mr. Evans say anything to my mother relative to paying her additional compensation for her services for taking care of him and doing his work, but he told me a few times. He said whoever took care of him would be well taken care of."

Robert Jones testified:

"I was familiar with the work that my wife performed for him. . . . He always said she would be well paid for in his will. I remember him telling her quite a few times and he told me quite a few times when we were together outside in the evening."

A practical nurse, residing in Waukesha and familiar with the reasonableness of charges for practical nursing, testified,— in answer to a hypothetical question describing Evans' diseased physical condition and the resulting consequences which necessitated the additional services claimed to have been rendered by claimant in addition to the furnishing of room and board,— that the reasonable value of such services was $25 per week.

The court stated in its findings of fact and conclusions of law (so far as here material):

that the estate of Evans is in excess of $14,000; that when he, in 1940, made arrangements for his room and board, "he represented to the claimant at that time that he could not afford to pay much but it was agreed to pay her $7 a week for room and board and paid said sum each week he stayed there;" that during the periods Evans stayed with claimant, from July 15, 1940, until September 5, 1940, and again from April 15, 1941, to June 10, 1944, he "wet his bed daily, messed his pants nearly daily and sometimes more than once, and many times after noonday meal would vomit up his meal and . . . the claimant during these periods changed his bed, washed, dried, aired and remade his bed daily, cleaned, washed and dried his underwear and pants almost daily. . . .

"8. That the time spent by the claimant in performing these services for the deceased was three to three and one-half hours per day, sometimes more, sometimes less, during a period from morning until late at night. . . .

"10. That on many different occasions through the whole time that the deceased was at the home of the claimant, said deceased promised and agreed to pay her well for her services; other times, would be well taken care of and other similar promises.

"11. That the statements, promises and agreements were made in the presence of the claimant, her husband, her son and her granddaughter.

"12. That the claimant Mary Jones relied on the promises and agreements of the deceased that she would be well paid for taking care of him.

"13. That the claimant rendered all such services, with the expectation of being paid therefor. . . .

"15. That there was no agreement between the claimant and deceased as to the exact amount she was to receive for her care, attendance and services to the deceased and she kept no book of account or record of the time spent."

And concluded:

that there was an agreement between the claimant and the deceased to pay extra for the personal services rendered the

deceased by claimant; that $15 per week is fair and reasonable compensation to pay the claimant for such services; and that she is entitled to judgment for $2,580 and interest.

On this appeal the administrator contends that the facts and circumstances clearly and conclusively establish a complete and entire contract under which the claimant received regular weekly payments in full for all services rendered; that it was the intention of the parties that the weekly payments of $7 were to be in full for all such services, unless and until a different amount was agreed upon; and that during Evans' lifetime no request was ever made for additional payment of moneys, nor did the claimant ever express any dissatisfaction with the amount which she had been receiving. In connection with these contentions appellant claims strenuously that the above-stated testimony given by the claimant's granddaughter, son, and husband as to statements and promises made in their presence by Evans to pay claimant for such services are so grossly incredulous that that testimony cannot be accepted by this court.

The credibility of that testimony was primarily a question for the trial court. As we said in *Graham v. Zellers,* 205 Wis. 542, 544, 238 N. W. 385,—

". . . the relative credibility and weight of the testimony of the witnesses, and the corroborative values of the circumstantial evidence, were primarily for the consideration of the trial court; and its findings are not to be disturbed on an appeal, if there is sufficient credible evidence to sustain them, and no error prejudicial to appellant occurred in ruling on the admission of evidence."

Upon reviewing the evidence, with that rule in mind, we are not warranted in concluding that the trial court erred in evidently considering the above-stated testimony given by the claimant and her witnesses as credible and sufficient to establish the above-quoted findings, Nos. 10, 11, 12, and 13, as well as the other findings and the conclusions of law based thereon.

Consequently, as we are not warranted in concluding that those findings are against the clear preponderance or great weight of the credible evidence, they cannot be set aside. As under the circumstances those findings cannot be disturbed, no useful purpose will be served by an extended discussion of the evidence.

It is true, as appellant contends, that in view of the proof as to the agreement between Evans and the claimant and her husband that Evans was to pay them $7 a week for the board and lodging furnished to him and that they accepted the weekly payments of $7, which he regularly made during his lifetime, there is a presumption that $7 a week is all they were entitled to receive, and that this amount was in full payment for all of Evans' obligations under that agreement. However, that is a presumption of fact which is rebuttable if there is proof which the court could consider credible and sufficient to establish that the decedent also promised or agreed to compensate the claimant for other services rendered in addition to the board and lodging and that such extra services were rendered by her in reliance upon such promises or agreement and with the expectation to receive additional compensation therefor. As we said in *Estate of Breitzman,* 236 Wis. 96, 98, 294 N. W. 489:

"The appellant strenuously contends that when periodical payments are regularly paid there is a presumption that such payments are in full for all obligations under the existing contract between the parties. This is true, but the presumption is one of fact and is rebuttable. 48 C. J. p. 700, sec. 215. And where a stated sum has been regularly and periodically paid for services during a decedent's lifetime, such payment is presumed to have been in full unless decedent is shown to have expressly agreed to additional payments. 24 C. J. p. 280, sec. 880.

"As to such express agreement the trial court found as follows: '6. That on two different occasions, once about the month of June, 1931, and once in March, 1938, said deceased

promised and agreed to "pay her (claimant) well for the care she had given him." ' '7. That said claimant rendered such services with the expectation of being compensated therefor.'

"The 1931 agreement thus found is supported by the testimony of two competent witnesses as to conversations between the deceased and the claimant—and that of 1938 by that of one competent witness to a statement of the claimant to the deceased. The agreement of 1931 was respecting future services covering all his life. The statements of 1938 related to both past and future services. The deceased not being a relative of the claimant, there is no presumption that the services of a personal nature or the day and night nursing were gratuitous. We consider that the findings quoted are sufficiently supported by the evidence, and no agreed compensation for such services appearing, they must be paid for at their reasonable worth."

Those conclusions and the reasons therefor are similarly applicable in the case at bar in view of the above-stated testimony of the claimant, her granddaughter, son, and husband in relation to the Evans' statements and promises to compensate the claimant for the additional services which she rendered for him. And the evidence as to the nature, extent, and reasonable value thereof fairly admitted of the court's findings and conclusions that $15 per week was fair and reasonable compensation therefor and that claimant is entitled to judgment for $2,580 with interest.

After Judge YOUNG had filed his decision, the administrator filed a petition for an order directing the claimant's attorney, Raleigh H. Thurwachter, to show cause why the decision and proceedings should not be vacated and set aside on the ground that as Thurwachter was public administrator of Waukesha county under an appointment by Judge YOUNG he was disqualified from sitting as judge in this matter in view of the provision in sec. 253.13, Stats., that,—

"No judge of the county court, his law partner, clerk or any person employed in or about his office shall be retained or employed as solicitor, attorney or counsel in any action or matter which may depend on or in any way relate to any judgment or

decree made or passed by him; nor shall he or any such person be solicitor, attorney or counsel for or against any executor, administrator, trustee or guardian appointed within his jurisdiction in any action brought by or against the executor, administrator, trustee or guardian as such, nor in any action relating to the official conduct or duty of such party."

At the time set for the hearing pursuant to the order to show cause the claimant appeared by her attorney, Thurwachter, but there was no appearance on behalf of the administrator; and the court denied the prayer of the petition. On this appeal the administrator contends that as Thurwachter was the public administrator he was disqualified to act as the attorney for the claimant; but apparently it is not now contended that Judge YOUNG was disqualified to act as the judge' herein. At all events the statute in question obviously does not purport to disqualify or render ineligible the county judge who appointed the public administrator and, consequently, there was no error on the part of the court or reason or occasion for vacating the judgment.

*By the Court.*—Order and judgment affirmed.

RECTOR, J., took no part.